IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 14-cv-01656-RBJ

MARC RUBAT DU MERAC,

    Plaintiff,

v.

COLORADO SCHOOL OF MINES,

    Defendant.

---

ORDER

---

This matter comes before the Court on Defendant's Motion for Summary Judgment [ECF No. 19]. The Court exercises original jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction pursuant to 28 U.S.C. § 1367. For the following reasons, the motion is granted.

## BACKGROUND

This case arises out of the defendant's decision to suspend the plaintiff, Marc Rubat du Merac, from graduate studies at the Colorado School of Mines pursuant to a finding that Mr. du Merac engaged in sexual harassment of an undergraduate student in violation of the school's harassment policy. Mr. du Merac brings this lawsuit alleging that his suspension was a form of reverse sex discrimination in violation of Title VII and the Colorado Anti-Discrimination Act.

The following facts are materially undisputed. In 2008, Mr. du Merac began a graduate studies program at the Colorado School of Mines ("CSM") in its Department of Metallurgical and Materials Engineering ("MME"). In conjunction with this program, Mr. du Merac served as a research assistant to Professor Ivar Reimanis. During the summer of 2010, an undergraduate woman (herein referred to as T.O.)[1] began working for Professor Reimanis as a research assistant. T.O. and Mr. du Merac shared an office with a number of other male students until one female graduate student joined the office. At the time she began her position with Professor Reimanis, T.O. was approximately 19 years old and Mr. du Merac was approximately 43 years old.

On November 17, 2011, T.O. resigned her research assistant position. She reported to Professor Reimanis that she was leaving the office because Mr. du Merac had been sexually harassing her throughout her tenure there. Professor Reimanis immediately called the school's Human Resources Department, a member of whom contacted T.O. the following day. Pursuant to her discussions with two scholarship advisors – Bruce Goetz and Deb Lasich, the head of the Women in Science, Engineering, and Mathematics program – T.O. decided to file a formal complaint against Mr. du Merac. *See* T.O. Depo. [ECF No. 19-3] 53:6–12.

CSM's Sexual Harassment Policy and Complaint Procedure (hereinafter the "policy") defines sexual harassment, in pertinent part, as follows:

> Sexual harassment shall, without regard to the gender of the alleged perpetrator or victim, consist of unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when . . . such conduct has the purpose or effect of unreasonably interfering with an individual's work or school

---

[1] Although there is no legal requirement that T.O.'s name be kept private, redacting her name seems appropriate given the nature of the underlying complaint. For this reason, all instances of her name have been redacted in the case file or, where too onerous, files have been restricted from public access.

2

        performance, or creating an intimidating, hostile, or offensive working or studying environment.

Def. Ex. 6. The policy adds that "retaliation in any form against an individual for reporting sexual harassment or cooperating in a sexual harassment investigation is strictly prohibited. Such retaliation shall be dealt with as a separate instance of sexual harassment." *Id.*

        CSM's policy provides that when a formal complaint of sexual harassment is filed, an attorney from CSM's Office of Legal Services and the Associate Vice President for Human Resources "shall jointly investigate the complaint by examining relevant documents, if any, and interviewing witnesses and other individuals designated by either party." *Id.* The policy adds that the investigators "will strive to conduct the investigation in a discrete and expeditious manner with due regard to thoroughness and fairness to both parties." *Id.*

        T.O.'s formal complaint was received by CSM's General Counsel on December 1, 2011. On December 6, 2011 Associate Counsel Esther Henry and Associate Vice President for Human Resources Mike Dougherty were designated as the investigators. That same day, Provost Terry Parker notified Mr. du Merac of the complaint and the upcoming investigation. On December 15, 2011, the investigators interviewed Mr. du Merac. *See* Def. Ex. 16 at 4. Following this interview, Mr. du Merac filed his own complaint against T.O. alleging that T.O. had made false accusations against him. This complaint was delivered to HR (though addressed to Provost Parker) on December 16, 2011. Def. Ex. 10, 11.

        T.O. had only identified four witnesses in support of her claims against Mr. du Merac. In his complaint, Mr. du Merac listed twenty-six witnesses, nineteen of whom had worked in the same office as T.O. and Mr. du Merac or who had participated in conversations in the office during the relevant time period. The other seven individuals were female character witnesses.

Due to the overlapping nature of the two complaints, Ms. Henry and Mr. Dougherty decided to investigate them concurrently. In all, the investigation process took six months and included interviews of approximately twenty witnesses as well as multiple interviews of T.O. and Mr. du Merac. With the exception of the character witnesses, who had not witnessed the interactions between T.O. and Mr. du Merac, the investigators interviewed all of the witnesses Mr. du Merac had provided. Each of these witnesses was asked about the specific allegations as well as to comment generally on the credibility of T.O. and Mr. du Merac.

On March 26, 2012, before the investigation was complete, Mr. du Merac sent the investigators an emailing stating that he had released both his and T.O.'s complaints as well as related materials to a number of witnesses. Def. Ex. 14, 15. The email includes a reference to Colorado's criminal libel statute along with the following admonition: "It should be noted that any person that aids or abets a person that is engaged in criminal libel could be considered as [*sic*] accessory to this felony." Def. Ex. 15. The email continues by asking the witnesses to read the complaints and to notify the investigators of any additional reactions beyond their interview responses. It ends by warning that "false claims are a disservice to those who make truthful harassment complaints and open the door to abuse of the School's policy," explaining that T.O.'s dislike for Mr. du Merac is no excuse "to warrant filing a serious complaint containing false accusations." *Id.* Accordingly, "[i]t is for this reason that I am asking you to share any information you have regarding these complaints." *Id.*

Mr. du Merac admits that he had been warned on numerous occasions regarding his obligation to maintain confidentiality throughout the investigation process. In fact, he had been

warned as recently as March 20, 2012, less than a week before he sent the confidential materials to many key witnesses.

Provost Parker directed Ms. Henry and Mr. Dougherty to investigate this incident as a separated instance of sexual harassment under CSM's anti-retaliation policy. *See* Def. Ex. 16. The Provost notified Mr. du Merac and T.O. of the additional investigation on April 17, 2012.[2]

The investigators submitted their reports on the three complaints – the T.O. complaint, the du Merac complaint, and the retaliation complaint – in early May 2012. Beginning with the T.O. complaint, the investigators found that out of nine types of accusations made against Mr. du Merac, the three that had been confirmed by other witnesses were more likely than not to have occurred. These three were: (1) comments about preparing T.O. for the "real world"; (2) the making of rude jokes; and (3) comments about T.O. not being valued in the work environment or being made to feel that no one would value her in the work environment. Def. Ex. 8 at 28. It was also found to be more likely than not that Mr. du Merac made multiple inappropriate comments to T.O. related to her appearance and intelligence. Four of the remaining six claims were dismissed against Mr. du Merac because no witnesses were able to confirm T.O.'s recollection of the events. Therefore, while the investigators felt that T.O. had been honest in her account, they deferred to Mr. du Merac. Lastly, with respect to the final two claims the investigators found that while they were more likely than not to have occurred, neither rose to the level of sexual harassment. One of these allegations was that Mr. du Merac had treated T.O. differently than the male undergraduate students based on her gender. *Id.* at 28–29.

Ms. Henry concluded:

---

[2] Mr. du Merac denies that he was notified of the investigation on that date. He does not, however, deny ever being notified.

> I believe that du Merac actively engaged in a campaign of harassment, bullying, and belittling of [T.O.] and that he just did not like her. However, I am uncertain whether du Merac engaged in this with malicious intent. Many witnesses opined on this issue but, at [*sic*] the end, his true intent and motivation is still unknown. I do believe that du Merac knew, at least on some level, that what he was doing was wrong and that he persisted in it. In any event, du Merac's behavior towards and interactions with [T.O.] over the period of a year and a half served to eviscerate her self-esteem and concept of self-worth.

*Id.* at 31. She then recommended that should Mr. du Merac choose to remain in his program he not be permitted to supervise other students or to act as a teaching assistant. She also recommended that he be relocated to another office on campus. *Id.*

Moving on to Mr. du Merac's complaint of false accusations, the investigators found that "it is more likely than not that many, if not all, of the allegations and behaviors described in [T.O.]'s complaint occurred. In fact, many witnesses in the investigation provided first-hand reports that many of the allegations and behaviors did occur." Def. Ex. 11 at 3–4. The investigators added that they did not believe that T.O. had fabricated any allegations against Mr. du Merac, even those that were not confirmed by any of the witnesses. At the very least, her accusations were made based on her genuine beliefs. *Id.* at 4. As such, the investigators recommended that Mr. du Merac's complaint be dismissed. Although the report is short, the investigators refer the reader to a more detailed account housed in the thirty-four page report on T.O.'s complaint outlined (briefly) above.

Finally, the investigators looked into the retaliation complaint lodged by Provost Parker against Mr. du Merac for having disclosed numerous confidential materials to key witnesses in the underlying complaints. Their report notes that Mr. du Merac had been repeatedly warned of his continuing obligation to keep all matters confidential and all materials private. In particular, Mr. du Merac received verbal notices on November 28, 2011 (during an initial meeting with HR

and Professor Reimanis prior to the filing of the formal complaint), December 15, 2011, and March 20, 2012. He was also cautioned against taking any retaliatory actions in a letter from the Provost dated December 6, 2011 and had received a reminder about confidentiality in an email from Mr. Dougherty dated December 8, 2011. *See* Def. Ex. 16 at 4. In spite of these numerous warnings, Mr. du Merac sent to thirteen witnesses and an MME department member personal correspondence; a copy of T.O.'s formal complaint; a copy of his counter-complaint; a four-page document entitled "Item by Item Justification for False Accusation"; a one-page document entitled "Inconsistencies in [T.O.]'s Complaint"; a three-page document entitled "Reasons that May Explain Why [T.O.] Made the Complaint Against Marc Rubat du Merac"; a one-page document containing a suggested witness list; a one-page document with an excerpt from the CSM sexual harassment policy; and a four-page document with excerpts from the Colorado criminal libel code and associated annotations. *See* Def. Ex. 16 at 5.[3]

In defense of his actions, Mr. du Merac told the investigators that he had waited for four months before disclosing any information,[4] that he had believed the interviews were complete,[5] and that he had asked to disclose the documents in an email dated March 21, 2012 from which he received no response. This email was sent a day after he had been reminded about his

---

[3] During his interview with investigators, Mr. du Merac only admitted to having sent a copy of T.O.'s complaint, his counter-complaint, and "a letter to read it." When pressed he also acknowledged that he sent a copy of the criminal libel code. The other documents listed above were discovered during the investigation. *See* Def. Ex. 16 at 5.

[4] Mr. du Merac showed a witness a copy of T.O.'s complaint prior to the individual's January 5, 2012 interview. *See* Pl. Ex. 18 at 10. (Please note that this document has been restricted from public access for privacy concerns. *See supra* note 1.)

[5] While this may be true, Mr. du Merac's email implores the witnesses to supplement their interviews by contacting Ms. Henry or Mr. Dougherty with additional reactions to the attached materials.

7

confidentiality obligations. Moreover, the text of the email makes no mention of disclosing these documents but instead notifies the investigators of an attached letter containing more concerns and including additional answers to the questions he had been asked during his March 20, 2012 interview. Pl. Ex. 25 at 1;[6] *see also* Def. Ex. 16 at 5. At the bottom of the second page of that letter (which is six pages long and single-spaced), Mr. du Merac states that he would like to know when it will be safe for him to discuss the complaint with his colleagues, indicating that he would like to send them a copy of both complaints. Pl. Ex. 25 at 3. After three business days without word from the investigators, Mr. du Merac went ahead and sent out the confidential materials, reading the investigators' silence as an implicit agreement that he could do so.[7]

As part of the final investigation report, Ms. Henry wrote:

> Based on information collected in independent interviews with both [T.O.] and du Merac, and information collected from various individuals, this investigator believes that it is more likely than not that du Merac engaged in retaliation in violation of the Mines Sexual Harassment Policy and Complaint Procedure. Using a reasonable person standard, these actions by du Merac, in releasing the materials, are found to meet the definition of sexual harassment as retaliation is considered to be a separate instance of sexual harassment.

*Id.* at 6. Ms. Henry also stated that she did not believe that Mr. du Merac genuinely believed that he had put the investigators on notice in his March 21, 2012 email but that, in any event, he had been warned on at least four separate occasions of his ongoing duty to keep the matter confidential. She concluded,

---

[6] This document has been restricted from public access for privacy concerns. *See supra* note 1.

[7] The investigators disagreed with Mr. du Merac's assessment of their silence. In Ms. Henry's report she notes that Mr. du Merac had been informed that she was going to be out of the office until March 26, 2012 via an out-of-office automated email. Def. Ex. 16 at 6. It was therefore unreasonable for him to take her silence as anything but silence.

> This investigator is concerned with the flagrant disregard du Merac exhibited for the investigators' and [Provost] Parker's instructions in this matter. In addition, this investigator is concerned that du Merac not only released [T.O.]'s complaint and his own counter-complaint but also generated new material with his own position and viewpoints on the matter, all of which he disseminated to witnesses in the investigation, which was still ongoing, and to MME Department Head Mike Kaufman. I believe these actions show an extensive lack of reason on the part of du Merac and also strongly suggest a lack of respect on his part for the Mines' process.

*Id.* at 7. In turn, she recommended that Mr. du Merac "be immediately removed from his graduate program for these violations of our Policy and that he not be permitted to reapply." *Id.*

In his own separate report, Mr. Dougherty wrote:

> While I believe that [Ms. Henry's] recommendation regarding du Merac's status at Mines is a reasonable response, an alternative response could be to place du Merac on suspension for a significant period of time, then allow him to finish his studies and complete his degree, perhaps with a time limit for completion and perhaps with other conditions attached as appropriate.

Def. Ex. 20 at 2. The investigators' reports are both dated May 10, 2012.

On May 17, 2012, Provost Parker made a final decision regarding the three complaints. Based on his independent review of the investigation reports and recommendations he found:

1. Mr. du Merac "did, in fact, engage in sexual harassment of [T.O.] over an extended period of time in violation of Mines' policy prohibiting such behavior."

2. T.O.'s sexual harassment complaint "did, in fact, have merit, and was based upon [T.O.]'s genuine belief of events that had transpired." In turn, Mr. du Merac's counterclaim alleging false accusations was without merit.

3. Mr. du Merac's "release of confidential information regarding the complaint to others involved in the investigation . . . did, in fact, constitute retaliation in violation of the School's policy." He admonished: "The release of the subject information on March 26

showed a callous disregard of the directives that had been given to [Mr. du Merac] by the investigators and me over the course of this investigation."

Def. Ex. 21 at 1.

With respect to the appropriate action to take against Mr. du Merac, the Provost found that "[t]he combined events surrounding the sexual harassment of [T.O.] and the retaliation by you require significant institutional response." *Id.* at 2. In turn, the Provost immediately suspended Mr. du Merac from his academic program with the option to return in the fall of 2013 should Mr. du Merac complete individualized training in sexual harassment prevention and related matters in the sole discretion of the Provost's Office. *Id.*

Mr. du Merac does not dispute any of the material facts discussed above. Instead, he approaches this case as an opportunity to prove that T.O. lied, that the underlying allegations against him were false. Any such attempt is misplaced.[8] The question properly before this Court is whether the Colorado School of Mines discriminated against Mr. du Merac on the basis of his sex when it undertook an investigation of a claim of sexual harassment lodged against him by a woman and found him guilty of the accusations. The simple answer is no.

## LEGAL STANDARD

The Court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden to show that there is an absence of evidence to support the

---

[8] In fact, Mr. du Merac had an opportunity to prove just that when he filed a lawsuit against T.O. in November 2012 alleging that she was guilty of libel, slander, extreme and outrageous conduct, and intentional interference with contractual obligations. *See* Plaintiff's Statement of Material Facts in Opposition to Defendant's Summary Judgment [ECF No. 20] ¶ 54. Instead of litigating the case to resolution, Mr. du Merac settled it for $500 and a letter stating that T.O. never intended for Mr. du Merac to be suspended. *See id.* ¶ 56. T.O. never admitted to having made false accusations. And contrary to Mr. du Merac's belief, settling a case is not the equivalent of winning one.

nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324. A fact is material "if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The Court will examine the factual record and make reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Concrete Works of Colorado, Inc. v. City and County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).

## ANALYSIS

Under Title VII, it is considered an unlawful employment practice for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Similarly, an employer may not "refuse to hire, to discharge, to promote or demote, to harass during the course of employment, or to discriminate in matters of compensation, terms, conditions, or privileges of employment against any person otherwise qualified because of disability, race, creed, color, sex, sexual orientation, religion, age, national origin, or ancestry" under the Colorado Anti-Discrimination Act. C. R. S. § 24-34-402.

When a plaintiff seeks to establish a case of disparate treatment using circumstantial evidence, the three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v.*

*Green,* 411 U.S. 792 (1973), is applied.[9] Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. 411 U.S. at 802. If the plaintiff meets this burden, the burden of production then shifts to the defendant to provide a legitimate, non-discriminatory reason for the employment action. *Id.* at 802–03. Finally, the burden shifts back to the plaintiff to show that the defendant's reasons were a pretext for unlawful discrimination. *Id.* at 804.

Typically, to establish a prima facie case of discrimination the plaintiff must show that (1) he belongs to a protected class; (2) he suffered an adverse employment action; and (3) the adverse employment action was suffered under circumstances giving rise to an inference of discrimination. *See, e.g.*, *Jones v. Denver Post Corp.*, 203 F.3d 748, 753 (10th Cir. 2000); *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1192 (10th Cir. 2000). However, when the plaintiff brings a reverse discrimination claim the prima facie case must be adjusted to account for the plaintiff's historically favored status. *See Livingston v. Roadway Exp., Inc.*, 802 F.2d 1250, 1252 (10th Cir. 1986). In such circumstances, the plaintiff "must, in lieu of showing that he belongs to a protected group, establish background circumstances that support an inference that the defendant is one of those unusual employers who discriminates against the majority." *Notari v. Denver Water Dep't*, 971 F.2d 585, 589 (10th Cir. 1992); *see also Adamson v. Multi Cmty. Diversified Servs., Inc.,* 514 F.3d 1136, 1149 (10th Cir. 2008). Alternatively, a plaintiff alleging reverse discrimination may establish his prima facie case by presenting direct evidence of discrimination or "indirect evidence sufficient to support a reasonable probability[]

---

[9] The Colorado Supreme Court has adopted the *McDonnell* burden-shifting framework in cases involving the Colorado Anti-Discrimination Act, although with modified language. *Colorado Civil Rights Comm'n v. Big O Tires, Inc.*, 940 P.2d 397, 400 (Colo. 1997), *as modified on denial of reh'g* (July 28, 1997). The modified language is not material to the outcome of this case.

that but for the plaintiff's status" he would not have suffered the adverse employment action. *See Notari*, 971 F.2d at 590.

Mr. du Merac has not met his burden of establishing a prima facie case of reverse sex discrimination. First, Mr. du Merac presents no evidence of direct discrimination. He likewise makes no attempt to show that CSM is "one of those unusual employers who discriminates against the majority." *Notari*, 971 F.2d at 589. Instead, he argues that but for his sex he would not have been suspended. Mr. du Merac fails, however, to present any indirect evidence sufficient to support this position.

Mr. du Merac relies on the investigative process itself alongside the results with which he disagrees as the primary basis for his prima facie case. Yet if anything the investigative process and its results were extremely preferential toward Mr. du Merac. As noted earlier, T.O. only listed four witnesses in support of her claim, whereas Mr. du Merac listed nineteen (not including pure character witnesses). Each of those nineteen individuals was interviewed pursuant to Mr. du Merac's request. Furthermore, in every instance in which the investigators were unable to obtain corroborating witness testimony concerning T.O.'s claims, they found in favor of Mr. du Merac. The investigators explained that while they believed T.O.'s account to be truthful, they could not find Mr. du Merac guilty of harassing her without a corroborating witness. Evidently, CSM places the presumption in favor of the accused, which in this case was a man.

Mr. du Merac's claim that the policy itself is prejudicial towards men is equally unconvincing. He complains that the policy – which does not distinguish between men and women – does not explicitly provide for the right to file a counterclaim of false accusations and

at the time did not allow for appeals of the investigators' findings.  Yet Mr. du Merac's false accusations claim was investigated, without any pushback from school officials.  And while the lack of an appeal is problematic, its deficiencies lie with due process, not sex discrimination.[10]

Moving along, although Mr. du Merac contends that he was subjected to an "interrogation style" interview in March of 2012, he makes no similar claim with respect to his December 2011 interview.  On the other hand, the March 2012 interview took place after investigators had met with all of Mr. du Merac's nineteen witnesses, and therefore after they would have had reason to believe that Mr. du Merac had been less than candid about the extent of his inappropriate behavior toward T.O.

Finally, Mr. du Merac's contention that he was not contacted by CSM officials with respect to his counter-complaint against T.O., whereas T.O. had been contacted by numerous officials, says very little on the topic of sex discrimination.  Mr. du Merac's allegation of false accusations was inextricably linked to T.O.'s accusations of sexual harassment.  Therefore, it is unclear in what respect officials would have needed to reach out to Mr. du Merac for additional information.  Furthermore, Mr. du Merac was in frequent contact with the investigators, submitting additional materials to them on six different occasions between December 2011 and May 2012.  There is no evidence in the record suggesting that T.O., who is described as having made "the least demands on the investigators," Def. Ex. 8 at 31, volunteered nearly as much assistance as Mr. du Merac.

It is also notable that had Mr. du Merac followed the repeated instructions of school officials and maintained his confidentiality obligations, he apparently would have been able to

---

[10] According to the parties, the policy has since been changed to include a right to an appeal.

continue his studies with limited ramifications.  Instead, it was Mr. du Merac's egregious violation of the school's confidentiality policy that led Ms. Henry to recommend immediate dismissal from the school and which ultimately resulted in his suspension.  Mr. du Merac has produced no evidence sufficient to support a reasonable probability that but for his sex he would not have been similarly reprimanded for his "callous disregard" of the directives he had been given throughout the investigation.  *See* Def. Ex. 21 at 1.

The facts of this case are substantially similar to those in *Durant v. MillerCoors, LLC*, 415 F. App'x 927 (10th Cir. 2011) (unpublished).  In that case, a female employee of MillerCoors reported to her supervisor that Mr. Durant, the plaintiff, had been sexually harassing her at work, and that he had threatened to have her and her son fired if she told anyone.  Mr. Durant's supervisor suspended him immediately pending an internal investigation.  The investigation took nearly two months to complete, and it resulted in a finding that Mr. Durant had violated the company's sexual harassment policy although Mr. Durant denied the charges.  Mr. Durant appealed the finding and lost.  As a result of his co-worker's complaints, the county sheriff's department filed criminal charges against Mr. Durant, who was ultimately acquitted.  Soon thereafter, Mr. Durant sued MillerCoors claiming that he had been subjected to reverse sex discrimination, among other wrongs.  The district court granted summary judgment in favor of MillerCoors, and the Tenth Circuit affirmed the order on appeal.  With respect to the reverse sex discrimination claim, the Tenth Circuit found that Mr. Durant's unsupported complaints – that the internal investigation was biased, false, and unfair; that MillerCoors improperly believed the female employee even though her reports were "incredible and unreliable;" and that he was deprived of his appeal rights – in no way indicated that MillerCoors favored women over men.

415 F. App'x at 931. The similarly speculative and conclusory assertions made by Mr. du Merac are likewise insufficient here.

In all, Mr. du Merac asks this Court to deny summary judgment on the grounds that he *believes* he would not have been suspended but for being a man. However, speculation "without any significant probative evidence tending to support the complaint," is insufficient to defeat a motion for summary judgment. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995) (internal quotation marks and citations omitted). The nonmoving party "must, at a minimum, direct the court to *facts* which establish a genuine issue for trial." *Id.* (emphasis in original). Mr. du Merac has not met his burden.

Even if Mr. du Merac has established a prima facie case of reverse sex discrimination, he would fall short of establishing a genuine issue of fact as to whether CSM's legitimate, non-discriminatory reason for the suspension was pretextual. Mr. du Merac may demonstrate pretext by revealing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Argo v. Blue Cross & Blue Shield of Kan.*, 452 F.3d 1193, 1203 (10th Cir. 2006). However, in determining whether the employer's proffered reason is pretextual this Court must "examine the facts as they appear to the person making the decision." *Watts v. City of Norman*, 270 F.3d 1288, 1295 (10th Cir. 2001) (internal quotation marks and citation omitted). "The relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs." *Rivera v. City & Cnty. of Denver*, 365 F.3d 912, 924–25 (10th Cir. 2004)

(internal quotations, citations, and alterations omitted). "An articulated motivating reason is not converted into pretext merely because, with the benefit of hindsight, it turned out to be poor business judgment. The test is good faith belief." *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998) (internal citation omitted).

Mr. du Merac contends that CSM's decision to suspend him was pretextual because the investigation established that he was not guilty of engaging in any harassing behavior. This is simply untrue. Upon reviewing the investigation report and the multitude of interview notes, it is evident that a number of witnesses corroborated T.O.'s account of certain events. Whether Mr. du Merac denies the reports is irrelevant so long as CSM honestly believed that Mr. du Merac engaged in sexual harassment and acted in good faith upon that belief. If any evidence supporting an inference of pretext exists, Mr. du Merac has not presented it to this Court.

Mr. du Merac evidently believes that his suspension was unfair. But the question presented to this Court is whether his suspension was the result of discrimination. Mr. du Merac has presented no evidence suggesting that it was.

## ORDER

Because Mr. du Merac has not met his burden of establishing a prima facie case of reverse sex discrimination, and because he cannot raise a genuine dispute of material fact suggesting that the reasons for his suspension were pretext for underlying discrimination, his case cannot survive summary judgment. Therefore, Defendant's Motion for Summary Judgment [ECF No. 19] is GRANTED. Final judgment dismissing this civil action and all claims within it will enter in favor of the defendant. Pursuant to Fed. R. Civ. P. 54(d)(1) and D.C.COLO.L.Civ.R. 54.1, the defendant is awarded its reasonable costs.

DATED this 11th day of May, 2015.

BY THE COURT:

_____

R. Brooke Jackson
United States District Judge